UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | |
|---|---|
| WAYNE RYAN,<br>    Plaintiff<br><br>  v<br><br>KEITH CLARK, Individually and in his capacity<br>as the former Chief of Police of the Village of<br>Bellows Falls, Vermont; VILLAGE OF BELLOWS<br>FALLS, VERMONT;  JOHN DUNFEE;<br>VERMONT STATE POLICE, and ERIC VITALI<br>    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION
DOCKET NO.

2:07-cv-168

## COMPLAINT

NOW COMES the Plaintiff, by and through his attorneys, Biederman Law Office, to complain as follows:

## PARTIES

1.  Plaintiff Wayne Ryan is a citizen and resident of the United States residing in Rockingham, Vermont.

2.  Defendant Keith Clark was, at all times relevant to the matters set forth herein, the Chief of Police of Defendant Village of Bellows Falls, Vermont.

3.  Defendant Village of Bellows Falls, Vermont, is a village chartered under the laws of the State of Vermont. The Village charter was created by the Vermont Legislature and codified in the Appendix to Title 24 of the Vermont Statutes, at Chapter 207.

4.  Defendant John Dunfee was, at all times relevant to the matters set forth herein, a Sergeant in the Village of Bellows Falls police department.

5.  Defendant Vermont State Police is an agency of the sovereign state of Vermont.

6.  Defendant Eric Vitali was, at all times relevant to the matters set forth herein, an officer of the Vermont State Police.

## JURISDICTION

7.  Jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1343, in that Plaintiff alleges deprivation of federal civil rights by persons acting under color of state law resulting in liability under 42 U.S.C. § 1983. Jurisdiction also is vested in this Court under 28 U.S.C. § 1331, in that the matter presents questions arising under the laws of the United States of America, specifically Title II of the Americans with Disabilities Act of 1990 and Section 504 of the Rehabilitation Act of 1973. Supplemental jurisdiction over the claims raised herein arising under State law is vested in this Court under 28 U.S.C. §1367.

## FACTUAL ALLEGATIONS

8.  Plaintiff is an owner of Nick's, Inc., a Vermont Corporation. Nick's Inc. owns and operates a certain restaurant and bar, Nick's Café, located in the Village of Bellows Falls, Windham County, Vermont.

9.  At all times relevant to the matters set forth herein, Nick's, Inc. was and is the holder of a first-class liquor license under Title 7 of the Vermont Statutes. Nick's, Inc. has held such a liquor license, with renewals, for more than 20 years and has conducted business at the same location for more than 20 years. At no time prior to the events described herein has Nick's Inc., or Plaintiff, or any person associated with Nick's Café, suffered any adverse action respecting said liquor license held by Nick's, Inc..

10. On June 16, 2006, a State Police Trooper, Defendant Eric Vitali, and a Officer of the Village of Bellows Falls Police Department, Christopher Brooks, (who is not a defendant

in this matter) entered Nick's Cafe.

11.   Plaintiff was seated by the door of Nick's Café on a stool when Defendant Vitali and Officer Brooks entered. Plaintiff had stationed himself at the door in that position in order that he might check the identification of persons who entered the bar to insure that all such persons were above the age of twenty-one, the legal age at which a person may purchase liquor in Vermont.

12.   On the evening of June 16, 2006, Plaintiff would not allow any person into the bar who failed to show proper identification upon demand for same by Plaintiff.

13.   Vermont Law, 7 V.S.A. § 602, provides that there are only five acceptable forms of identification which holders of a liquor license may accept as proof of a patron's age.

14.   Both Officer Brooks and Trooper Vitali were working a detail designed to curb drinking by persons under the legal drinking age. The detail is known as the START detail.

15.   Officer Brooks and Defendant Vitali were in plain clothes.

16.   Upon presenting themselves before Plaintiff, Plaintiff demanded identification from both Officer Brooks and Trooper Vitali. Officer Brooks and Trooper Vitali then presented identification indicating that they were police officers.

17.   By law, a police identification card is *not* an acceptable form of identification to prove legal drinking age as it is not among the five (5) forms of identification specified under 7 V.S.A. § 602. A Vermont Motor Vehicle Operator's license (driver's license) *is* an acceptable form of identification under said statute.

18.   Plaintiff rejected the officers' identification and insisted upon seeing acceptable identification.

19. Officer Brooks presented his Vermont motor vehicle operator's license and was allowed to enter into Nick's Café.

20. Trooper Vitali did not present his Vermont motor vehicle operator's license and was denied entrance into Nick's.

21. Trooper Vitali is a person whose youthful appearance makes him a "person of questionable age" under Vermont Liquor Control General Regulation 13, triggering the requirement requirement that the liquor licensee insist upon one of the five forms of acceptable identification. Defendant Vitali has agreed with that conclusion under oath in prior testimony.

22. When Trooper Vitali was denied entrance into Nick's Café, Plaintiff lightly placed his hand upon Trooper Vitali's shoulders and directed Trooper Vitali to the door leading to the outside of Nick's.

23. Neither Trooper Vitali or Officer Brooks has claimed that this action on the part of Plaintiff was anything other than a signal by Plaintiff to Trooper Vitali directing him to leave the premises.

24. As both Officer Brooks and Trooper Vitali have previously testified under oath, neither officer believed that Plaintiff had committed an assault upon Trooper Vitali. Both understood Plaintiff's touching of Trooper Vitali to be directional rather than confrontational.

25. Trooper Vitali and Officer Brooks then left Nick's Café, despite the fact that Officer Brooks had been admitted to Nick's Café.

26. Trooper Vitali took out his handcuffs and intended to arrest Plaintiff for Obstruction of

-4-

Justice, a charge which would have had no possible application under the facts known to Trooper Vitali. In fact, at the time Trooper Vitali took out his handcuffs, he did not even know what the elements of the charge of Obstruction of Justice were.

27. Officer Brooks urged Trooper Vitali to remain calm and called his superiors for guidance.

28. Defendant John Dunfee, a Bellows Falls Police Sergeant, was on duty and went to Nick's. Sergeant Dunfee was Officer Brooks's immediate supervisor at the time.

29. Sergeant Dunfee had commenced work with the Village of Bellows Falls Police Department only one day earlier and had never served as a police officer in the State of Vermont prior to that date.

30. Defendant Dunfee, along with Officer Brooks and Vitali, entered Nick's to discuss the matter with Plaintiff.

31. Plaintiff is completely deaf and has been deaf for many years. His deafness prevents him from hearing human speech or, in fact, almost any sound at all.

32. Plaintiff is also an amputee, having lost his leg at the pelvis during his youth. Plaintiff's deafness was caused by medication prescribed for him at the time he lost his leg.

33. Because Plaintiff is deaf, Plaintiff had been entirely unable to hear what Officer Brooks or Defendant Vitali were saying when they first came to the door of Nick's Café. When the officers told Plaintiff that they were part of a START detail which was seeking to deter underage drinking, Plaintiff was entirely unable to hear them. Likewise, Plaintiff had no practical means to determine whether, at the time they showed their police identification, Officer Brooks and Defendant Vitale were on duty or were merely off-duty officers, one of whom lacked proper identification under Vermont law.

-5-

34.    When Defendant Dunfee entered Nick's Café after being summoned by Officer Brooks, Defendant Dunfee began to speak to Plaintiff, apparently unaware of Plaintiff's deafness.

35.    However, when Sergeant Dunfee entered Nick's with Officer Brooks and Defendant Vitali, Plaintiff's son, who was working at Nick's at the time, went over to where his father and the law enforcement officers were.

36.    Plaintiff's son informed the officers that his father was deaf. Plaintiff's son also indicated to the officers that Plaintiff can read lips under proper conditions to a degree that allows him to have some reasonable degree of communication with speaking persons.

37.    In fact, Plaintiff is not a trained lip reader, and environmental conditions, including lack of sufficient light, reduce his ability to read lips.

38.    Plaintiff's son told the officers, accurately and truthfully, that Plaintiff can better understand spoken language when Plaintiff's son speaks because Plaintiff is more familiar with his son's lip movements. From that point forward, Plaintiff's son attempted to assist the officers in communicating with Plaintiff and assisted Plaintiff in communicating with the officers.

39.    Thus, as the officers would speak to Plaintiff, which they did from in front of him, alongside of him, and sometimes not facing Plaintiff, all without regard to their position, Plaintiff's son would repeat what the officers had said.

40.    Plaintiff's son made clear to the officers that Plaintiff could not hear.

41.    None of the officers believed Plaintiff could not hear them notwithstanding the representations of Plaintiff's son as to his father's deafness.

42.    All of the officers interpreted the son's involvement as being either useless or an

interference with the officers. They did so notwithstanding the fact that the son had explained that he could best communicate with his father because of their relationship and Plaintiff's familiarity with his son's lip movements.

43. Defendant Dunfee instructed Plaintiff that if Plaintiff did not allow the police officers to enter the premises, he would close Nick's for business. The night of June 16, 2006 was a busy night at Nick's Café because it was alumni weekend in Bellows Falls. Closure would have meant substantial loss of revenue.

44. After being threatened with closure of the bar, Plaintiff allowed the officers to enter including Trooper Vitali, who had no form of identification acceptable under Vermont's liquor laws.

45. When they entered, the officers found no underaged drinkers. Neither did they find any persons who appeared to be underage.

46. The officers, including Officer Brooks, Trooper Vitali, and Sergeant Dunfee, were clearly more concerned with requiring Plaintiff to conform to their instructions to let them into Nick's Café than they were with performing police duties respecting the START detail. The officers' priorities are evident because (a) Officer Brooks, despite being allowed entry, never looked for underaged persons; (b) when Plaintiff refused to allow Defendant Vitale to enter, neither Trooper Vitale nor Officer Brooks monitored the side door or exit to determine the age of persons leaving Nick's Café, and (c) when the officers actually entered Nick's Café, they performed a cursory inspection and did not enter the bathrooms or the kitchen area, despite their claimed right to examine the entire premises.

47. Five days later on June 21, 2006, Trooper Vitali, along with at least five and possibly

-7-

more Vermont State Police, went to Nick's and arrested the Plaintiff for the felony of impeding a public officer in the performance of his official duties, in violation of 13 V.S.A. § 3001.

48.   At the time they arrested Plaintiff, Plaintiff was at Nick's Café with only a female employee, the Plaintiff's father-in-law, and two male patrons. Further, said arrest occurred in mid-afternoon.

49.   The decision to arrest, rather than to issue a citation to appear in court, was done made to intimidate and cause fear in Plaintiff, and with the improper purpose of educating Plaintiff that the Vermont State Police and Defendant Vitali were to be obeyed when they sought entrance into Nick's Café.

50.   At all times prior to the dismissal of the criminal case commenced with the above described arrest, Defendant Vitali erroneously believed that Plaintiff had a duty to admit Vitali even though Vitali lacked proper identification under Vermont's liquor laws.

51.   Prior to arresting Plaintiff with an unnecessarily large complement of police officers, Trooper Vitali had contacted Officer Brooks to inform Officer Brooks of the impending arrest.

52.   Officer Brooks then informed the Chief of Police, Defendant Clark.

53.   Defendant Clark then contacted a reporter for the Brattleboro Reformer, a local newspaper, to inform the reporter that the state police were about to make an arrest at Nick's.

54. Trooper Vitali elected to handcuff Plaintiff at the time of arrest despite the fact that he was informed by a more senior member of the Vermont State Police that the decision to handcuff was entirely Defendant Vitali's to make.

55. Trooper Vitali indicated that he did in fact want to handcuff Plaintiff.  Prior to handcuffing Plaintiff, Trooper Vitali shouted at Plaintiff, "You *will* turn around and we *will* handcuff you or we will *carry you* out of here!"

56. Plaintiff had asked Trooper Vitali not to handcuff him.

57. Because of his prosthetic leg, Plaintiff could not walk while both hands were in handcuffs. He informed Trooper Vitali of this fact, and Trooper Vitali then removed one handcuff but attached that handcuff to his own arm.

58. At that time, and before leaving Nick's Café, at the time Vitali decided to handcuff Plaintiff, Vitali and other members of the Vermont State Police knew that there was a reporter outside of Nick's Café.

59. Trooper Vitali then walked out of Nick's with Plaintiff handcuffed to him.

60. Because the reporter had been alerted by Defendant Clark, the reporter was stationed outside of Nick's waiting for the arrest to occur.

61. When Plaintiff emerged from Nick's handcuffed to Trooper Vitali, the reporter took photographs of the scene.

62. One of those photographs was placed on the front page of the Brattleboro Reformer the next day along with the news story appended hereto as Appendix 1.

63. The decision to arrest Plaintiff, and to handcuff Plaintiff, and to lead Plaintiff in front of a reporter, rather than to cite him to appear in court, was made despite the fact that

Plaintiff had no criminal record, posed no risk of flight, was known to be deaf, and was not known for any history of violence because he had no such history. The decision to arrest Plaintiff was therefore not made for any valid police purpose but rather solely to demonstrate to Plaintiff that he would receive harsh treatment for defying Defendant Vitali.

64.    In fact, Defendant Vitali intended to do nothing more than take Plaintiff to the Vermont State Police Barracks in Rockingham and then release him with a citation to appear, all of which could have been done without any arrest at all.

65.    Plaintiff was transported to the Vermont State Police Barracks,  fingerprinted, photographed, and released by the State Police with a citation to appear in Court to answer the charge of impeding a law enforcement officer in the performance of his official duties, in violation of 13 V.S.A. § 3001.

66.    Despite the fact that Defendant Vitali and his superior officers in Defendant Vermont State Police knew that Plaintiff was deaf, Defendant Vermont State Police and Defendant Vitali made no accommodation whatsoever to enable Plaintiff to understand what was occurring or why. While Plaintiff was able to understand that he was being arrested and charged, Plaintiff was unable to understand large portions of what Defendant Vitali or others were saying to him.

67.    Plaintiff was subjected to a booking process during which no reasonable accommodation was given to Plaintiff on account of his deafness. In particular, during the booking, he was given instructions by officers of the State Police who did not face him, did not look at him, and gave him little opportunity to see their lips. Virtually no effort was made by

-10-

the Vermont State Police to accommodate Plaintiff's hearing difficulty. By the time of his booking procedure, the Vermont State Police was well aware of the fact that Defendant had hearing difficulty. During the booking process, when Plaintiff answered either inappropriately or not at all to questions being asked him because he could not hear what was occurring, the State Police ignored his responses and continued to book him despite the obvious fact that Plaintiff could not hear what they were saying. Plaintiff's deafness was so obvious that at one point that, in a rare moment of accommodation, the booking officer wrote down a word so Plaintiff could read it.

68.     Defendant Vermont State Police's failure to accommodate Plaintiff's deafness during the booking process was especially egregious in view of the fact that Plaintiff's son was at the State Police Barracks but was not invited into the room to assist his father with communication during the process. On-duty personnel, including Defendant Vitali and the booking officer, knew that Plaintiff's son was present at the barracks but did not inform Plaintiff of this fact until the process was entirely completed. At all times during the booking process, Defendant Vitali and other members of the Vermont State Police knew that Plaintiff's son could assist Plaintiff in communicating what was occurring in the process, yet said accommodation was denied.

69.     The Vermont District Court dismissed the charges against Plaintiff, ruling that Plaintiff could not be guilty of the crime of impeding a law enforcement officer because he was doing only those acts which he was permitted to do–indeed, required to do–by law in verifying patrons' ages by demanding they present legally acceptable forms of identification.

-11-

**FIRST CLAIM FOR RELIEF**

Plaintiff re-alleges paragraphs 1 through 69 above as if set forth in full herein.

70.   Defendant Clark became aware of the fact that the Plaintiff was to be arrested only because he occupied the official capacity of the Chief of Police of Defendant the Village of Bellows Falls.

71.   Because of his official capacity as Police Chief, Defendant Clark knew where the arrest was to occur and the approximate time of the arrest.

72.   Defendant Clark expressly wished to have the arrest publicized.  Defendant Clark desired to have the arrest photographed and anticipated that photographs would be taken in part because he believed the reporter to be a photographer for the *Brattleboro Reformer*.

73.   Defendant Clark further could reasonably anticipated that Plaintiff would be in handcuffs at the time the photographs were taken, because it is common for persons arrested and transported to be handcuffed at the time of transport.

74.   Defendant Clark, therefore, expected and understood that the State Police would be leading Plaintiff from Nick's in handcuffs and expressly took action to ensure that a "perp walk" photograph or photographs would be taken of Plaintiff while he was in custody.

75.   Defendant Clark had no legitimate governmental interest in having "perp walk" photographs of Plaintiff circulated in the newspaper.

76.   In fact, the Police Department of Defendant Village of Bellows Falls sent no officers to Nick's to participate in the arrest and had no legitimate interest in the arrest at all.  The officer who claimed to have been wrongfully excluded from Nick's was a member of the Vermont State Police, not the Bellows Falls Police Department.  Likewise, no Bellows

Falls police official or member was involved in the decision to arrest, nor to suggest prosecution of Plaintiff.

77.   The sole and exclusive purpose for which the Defendant Clark arranged and/or enabled the taking of the "perp walk" photographs was to embarrass and humiliate Plaintiff for the reasons described below.

78.   Defendant Clark effectively arranged and enabled the "perp walk" described above.

79.   Defendant Clark, in providing the reporter with information he possessed solely by virtue of his official capacity as Chief of Police, intended to and did effectively implement and enable a seizure of Plaintiff's image.

80.   Said "perp walk," and the seizure which Defendant Clark arranged and enabled, was arranged and enabled for the particular purpose of retaliating against Plaintiff for the exercise of Plaintiff's rights to freedom of speech and freedom to petition the government for redress of grievances.  The First and Fourteenth Amendments to the United States Constitution secure Plaintiff in the exercise of such rights.

81.   Prior to the incidents described above, including the arranging of the "perp walk" and seizure of Plaintiff's image, Plaintiff had confronted Defendant Clark on the subject of singling out Nick's Café for selective law enforcement.  Plaintiff had also informed Defendant Clark that Plaintiff believed Defendant Clark was acting to harass Plaintiff and Nick's Café.

82.   Also, prior to the events described above, at a meeting of the Liquor Control Commissioners of the Town of Rockingham (not a Defendant herein)  in which the Incorporated Village of Bellows Falls is located, Defendant Clark had urged that

-13-

restrictions be placed upon any liquor license granted to Nick's.

83.    At said meeting, Defendant Clark informed the Liquor Control Commissioners that Nick's had committed numerous violations of the Vermont Liquor laws.

84.    The request to the Liquor Control Commissioners respecting Nick's liquor license was unique, as Defendant Clark had made no other requests to restrict the license of any other liquor license holder in the Village of Bellows Falls or Town of Rockingham.

85.    Following said hearing, the Liquor Control Commissioners of Rockingham attached the requested conditions to the liquor license granted to Nick's, Inc.

86.    However, in a televised and widely publicized hearing held thereafter, the Liquor Control Commissioners removed said conditions when Plaintiff, through counsel, complained that such conditions had been unconstitutionally attached to Nick's license, without notice or hearing.

87.    Further, at said hearing, an encounter occurred between Plaintiff's counsel, George Nostrand, Esq., and Defendant Clark wherein Attorney Nostrand informed the Liquor Control Commissioners that there had been no liquor law violations brought to the attention of Nick's, Inc., or Plaintiff. Instead, Attorney Nostrand produced at the hearing a letter of commendation to Nick's Inc. which the Commissioner of Liquor Control had issued within the prior year, indicating that Nick's, Inc., had passed a test wherein a minor in the employ of the Department of Liquor Control had been refused service due to his presenting insufficient proof of legal age.

88.    The reversal of the conditions on Nick's, Inc.'s liquor license was contrary to Defendant Clark's wishes.

-14-

89.   At said meeting, Defendant Clark also suggested to the Liquor Control Commissioners that they needed no proof whatsoever to attach whatever conditions of any nature they wished to any liquor license.  Defendant Clark's suggestion is inaccurate, untrue, and erroneous, and Atttorney Nostrand told the Commissioners so on behalf of Nick's Inc.

90.   Contrary to Defendant Clark's request, the Liquor Control Commissioners removed the conditions previously placed on Nick's liquor license, and granted Nick's a liquor license with no conditions.

91.   Thereafter, Plaintiff purchased an advertisement in a local newspaper, the *Town Crier*, which circulates within the Village of Bellows Falls.  Said newspaper advertisement, a copy of which is appended hereto as Appendix 2, is clearly critical of the Village of Bellows Falls police department.

92.   The placement of said advertisement is protected speech activity and political comment protected by the First and Fourteenth amendments to the United States Constitution.

93.   Plaintiff's act of complaining to a police chief about being singled out for enforcement and/or harassment, and Plaintiff's act of complaining to the Liquor Control Commissioners respecting conditions placed upon his liquor license at the urging at Defendant Clark were protected activities petitioning the government for redress of grievances and protected speech activities under the First and Fourteenth Amendments to the United States Constitution.

94.   The "perp walk" arranged by and/or enabled by Defendant Clark constitutes unlawful and unconstitutional retaliation in violation of the rights secured to Plaintiff by the First and Fourteenth Amendments to the United States Constitution.

95.    Said acts further constituted an unlawful seizure of Plaintiff's image without furthering proper governmental purposes in violation of rights secured to Defendant under the Fourth and Fourteenth Amendment to the United States Constitution.

96.    Each of Defendant Clark's acts, and all of his acts together, as described above, were taken by Defendant Clark under color of State law.

97.    The Charter of the Village of Bellows of Falls, the grant of which Charter is an Act of the Vermont Legislature, vests in the Chief of Police the duty and power to direct the police force. *See* 24 V.S.A. § 207-17(b) (providing that "[t]he direction and control of the entire police department, except as otherwise provided, shall be vested in the chief of police.")

98.    In such capacity, Defendant Clark, while Chief of Police, set and created policy for the Village of Bellows Falls respecting police work and police activity.

99.    The above described actions of Defendant Clark were acts of the Village of Bellows Falls through official act, policy, charter, custom, and usage.

100.    Defendant Clark is liable to Plaintiff for damages under 42 U.S.C. § 1983.

101.    All of the actions of Defendant Clark were intentional, willful, and deliberate.

102.    Defendant Village of Bellows Falls is a municipality under Vermont law and a "person" within the meaning of 42 U.S.C. § 1983.

103.    Defendant Village of Bellows Falls is liable to Plaintiff under 42 U.S.C. § 1983, as the above described actions constitute governmental acts giving rise to municipal liability under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

-16-

## SECOND CLAIM FOR RELIEF

Plaintiff re-alleges paragraphs 1 through 103 above as though fully set forth herein.

104. As recited above, when Defendant Sergeant Dunfee came to Nick's Café at the request of Officer Brooks, Sergeant Dunphee informed Plaintiff that if Plaintiff did not admit the officers, Sergeant Dunphee would close Nick's immediately.

105. In making said representation, Defendant Dunfee was acting under color of state law, in that he claimed a power on the part of police officials to close Nick's if Plaintiff refused to allow Defendant Vitali to enter.

106. In fact, no police officer has the authority, right, or power under any Vermont statute or regulation to close a licensed business.

107. Under both statute and regulation, licensees holding first-class liquor licenses in Vermont are entitled to well defined process and procedure prior to any suspension, removal, or other adverse governmental action against their licenses.

108. Defendant Dunfee, as a police officer, had a duty to know the liquor laws and procedures prior to threatening Plaintiff or any other license holder of a Vermont liquor license with closure of a licensed business, something Vermont law clearly does not authorize.

109. The liquor laws and regulations of the State of Vermont are clearly enunciated and settled statements of law and policy which any police officer is bound to know or ought to take reasonable steps to know.

110. The sole purpose for which Defendant Dunfee threatened closure was to unlawfully coerce Plaintiff to admit the officers notwithstanding Trooper Vitali's lack of proper identification and Plaintiff's right to refuse Trooper Vitali entry.

111.   The right of a business owner to admit or not admit whomever he or she chooses is a liberty right and a property right under the Fourteenth Amendment to the United States Constitution. The right of a first-class liquor license holder to operate its business without unlawful interference and without being compelled to violate a liquor control law is a property right within the protection of the Fourteenth Amendment to the United States Constitution.

112.   As found by the Vermont District Court in the case of *State v. Ryan*, Windham District Court docket number 923-7-06, Plaintiff was legally entitled to refuse entry to persons, including Trooper Vitali or other police officers, who did not present proper identification demonstrating proof of lawful age.  In other words, Plaintiff acted lawfully by refusing entry to Trooper Vitali by doing only acts which the law permitted him to do.

113.   In fact, a Liquor Control Regulation promulgated by the Commissioner of the Department of Liquor Control, General Regulation 13, requires license owners to demand identification from persons of questionable age before serving them alcoholic beverages, and further sets forth precisely which types of identification a licensee may accept.

114.   Vermont license holders may lawfully implement said requirements by stationing a door keeper at the door to require production of proper identification before admittance to a licensed premises.

115.   In fact, in April, 2006, Defendant Clark, while the Chief of Police of Village of Bellows Falls,  had attempted to persuade the Liquor Control Commissioners of the Village of Bellows Falls to *require* a door keeper at the door of Nick's to do precisely what Plaintiff was actually doing on the evening of June 16, 2006, *i.e.*, requiring all persons who were

-18-

entering Nick's to present a form of identification valid under Vermont law.

116.    When Defendant Dunfee threatened Plaintiff with closure of Nick's if he did not allow

entry of Trooper Vitali, Defendant Dunfee, acting under color of state law, denied Plaintiff

due process rights secured by the Fourteenth Amendment to the United States

Constitution in that, *inter alia*, he (a) required Plaintiff to surrender the above described

property right and liberty right to refuse Trooper Vitali entry and to conduct his business

in accordance with the terms of his license and (b) threatened to deny Plaintiff the process

that is due Nick's, Inc., in which Plaintiff is an owner, if Plaintiff did not conform to

Defendant Dunfee's unlawful instruction.

117.    Defendant Dunfee, without due process, and in violation of State law and due process

rights secured by the Fourteenth Amendment, required Plaintiff to make a Constitutionally

impermissible choice.  Specifically, Plaintiff could either admit the police officers, in

violation of Plaintiff's permit and Vermont Law, or Plaintiff could comply with Vermont

Liquor Control law and thus suffer the loss of his liberty right to admit whom he chose,

and/or his property right to conduct lawful business under his first-class license.

118.    Defendant Dunfee is liable to Plaintiff for said deprivation under 42 U.S.C. § 1983.

**THIRD CLAIM FOR RELIEF**

Plaintiff re-alleges paragraphs 1 through 118 above as if set forth in full herein.

119.    Defendant Village of Bellows Falls receives and accepts federal funds for numerous

programs operated by Village Government, including by not limited to police services,

equipment, and facilities.  Said funds are for "programs" as that term is defined in the

Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, specifically at 29 U.S.C. § 794.

120.    Defendant Vermont State Police receives and accepts federal funds for numerous programs operated by it, including but not limited to police services, equipment, and facilities. Said funds are for "programs" as that term is defined in the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, specifically at 29 U.S.C. § 794.

121.    Under Section 504 of the Rehabilitation Act of 1973,

> No otherwise qualified individual with a disability in the United States, as defined in section 705 (20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.] ...

122.    Defendant Vermont State Police and Defendant Village of Bellows Falls are "public entities" within the meaning of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131 *et seq.*

123.    Defendant Vermont State Police and Defendant Village of Bellows Falls enjoy no immunity, including but not limited to sovereign immunity, from private claims arising under the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* nor under the Title II of the Americans with Disabilities Act ("ADA"), as in enacting said legislation, Congress authorized suits by private citizens against States of the United States.

124.    Plaintiff suffers from two physical disabilities which interfere with one or more major life activities. Specifically, Plaintiff is deaf, which interferes with numerous life activities, and is also an amputee who cannot walk without assistance of a cane and is otherwise restricted by the amputation of his leg at the pelvis.

125.    Plaintiff is an individual with a disability under both the ADA and the Rehabilitation Act of 1973, in that the above-described physical impairments interfere with one or more

major life activities including but not limited to hearing, communicating, and mobility.

126.    Plaintiff is a "qualified individual with a disability" in that, *inter alia*, reasonable accommodation for Plaintiff's deafness enables Plaintiff to effectively communicate and understand communication from other persons.

127.    Under the Rehabilitation Act of 1973, it is unlawful for Defendant Vermont State Police and/or Defendant Village of Bellows Falls to deprive Plaintiff of the opportunity to participate in any program, service, or activity of any state or subdivision of any state which received federal funding for programs, or to require Plaintiff to accept lesser service or participation than a person without disability, or to otherwise suffer discrimination on account of such disability.

128.    Under Title II of the ADA, it is unlawful for Defendant Vermont State Police and/or Defendant Village of Bellows Falls to deprive Plaintiff of the benefit of any program, service, or activity on account of disability without reasonable accommodation for such disability.

129.    When Defendant Vitali, along with Officer Brooks, first encountered Plaintiff in Nick's on the night in question, Vitali and Brooks told Plaintiff verbally that they were part of a "START unit detail," a police detail seeking to enforce Vermont liquor laws respecting underaged persons and the statutes and regulations governing proper identification of persons of questionable age.

130.    Plaintiff was entirely incapable of hearing or understanding any of this information on account of his deafness.

131.    When Plaintiff demanded a form of identification which was sufficient under Vermont

law, Officer Brooks complied with the request, but Defendant Vitali did not comply because, as he later testified under oath, he did not have a driver's license with him nor available to him at the time he sought entry to Nick's.

132.   Shortly after Plaintiff rejected Trooper Vitali's identification, Plaintiff's son informed both Defendant Vitali and Officer Brooks of Plaintiff's hearing disability.

133.   Plaintiff is profoundly deaf, having been deafened in his late teens as the result of medication he was prescribed, and cannot hear human speech at all.

134.   When Plaintiff's son attempted to speak to his father using clear lip movements while standing directly in front of his father, Defendant Vitali, disregarding information he had already received respecting Plaintiff's inability to hear, became angry and wanted to arrest Plaintiff, in part because he believed that Plaintiff and Plaintiff's son were mocking the officers.

135.   After the incident was over, Trooper Vitali reported the incident to his superiors including at least two sergeants and a lieutenant of the Vermont State Police.

136.   Despite the fact that Trooper Vitali himself did not claim to have been assaulted and did not claim that Plaintiff's touching of him was anything more than communication, Trooper Vitali, acting either alone or in concert with other Vermont State Police superiors, decided to arrest Plaintiff rather than to cite him as a means to compel him to answer charges of impeding a law enforcement officer in the performance of his duties.

137.   Defendant Vitali, because of his anger and/or because of direction from other members of the Vermont State Police, elected to arrest Plaintiff rather than to cite him notwithstanding the complete absence of exigent circumstances and notwithstanding the

fact that five days had passed since the incident in which Vitali's identification was rejected.

138. Notwithstanding the fact that Trooper Vitali and other members of the Vermont State Police clearly had been informed that Plaintiff was disabled on account of his hearing impairment and could not understand what the police officers were saying, Trooper Vitali and Defendant Vermont State Police made no accommodation whatsoever on account of Plaintiff's disability to provide any means of communication by which police officers might effectively communicate to Plaintiff what was occurring during the arrest, transport, or booking processes.

139. Defendant Vermont State Police might easily have accommodated Plaintiff when they arrested, transported, and booked him.

140. Indeed, the accommodation might easily have occurred notifying Plaintiff that he was requested to accept a citation, by notifying Plaintiff's counsel, George Nostrand, who was well known to have represented Nick's at a recent Liquor Control Commission meeting or by serving a citation upon Plaintiff at his personal residence.

141. Accommodation might also have been made by providing Plaintiff with written materials explaining the processes, by utilizing computer or other electronic aids to assist Plaintiff, or by providing a qualified speech translator for the deaf or hearing- impaired to assist Plaintiff in the process.

142. Rather, Trooper Vitali and Defendant Vermont State Police specifically elected to discriminate against Plaintiff by providing no assistance and by arresting Plaintiff under circumstances where the alternative of issuance of a citation could have accomplished the

-23-

same goal, *i.e.* commencement of the criminal process (which was later dismissed on motion).

143.   In fact, Defendant Vitali and a large complement of members of the Vermont State Police, with the express approval of Defendant Vitali's superiors, intentionally utilized a large show of force for no legitimate police purpose but, rather, to intimidate Plaintiff, which they succeeded in doing.

144.   Because Defendant Vermont State Police elected to arrest, rather than cite Plaintiff, under policies of Vermont State Police, Trooper Vitali and others were allowed to handcuff Plaintiff as described above. This handcuffing was designed to intimidate, humiliate and psychologically injure Plaintiff.

145.   Once Plaintiff was, in fact, arrested, he was brought to the State Police Barracks. At the State Police Barracks, for approximately one half hour, Plaintiff was subjected to a booking process, including fingerprinting and undergoing booking photographs without any accommodation to his deafness. During said booking process, the booking officer and others could repeatedly determine that Plaintiff was hard of hearing. Indeed, on at least one occasion, the officer who was in charge of the booking wrote down some words to convey a message to Plaintiff.

146.   Defendant Vermont State Police could easily have accommodated Plaintiff during the booking process. No effort was made to speak to Plaintiff while an officer was looking directly at him which might have assisted in lip reading. Moreover, the Vermont State

Police knew, at the time of booking, that Plaintiff's son was present at the State Police Barracks and could have assisted in the booking process. Notwithstanding the fact that reasonable accommodation was practicable, none was made.

147. The police barracks, booking room, and police car are "facilities," "programs," "services," and "activities" within the meaning of the Americans with Disabilities Act and the Rehabilitation Act.

148. The acts described above were done with malice.

149. By intentionally, willfully, and deliberately failing to accommodate Plaintiff in any fashion on account of his deafness, notwithstanding the fact that his deafness was known its members, Defendant Vermont State Police violated the Rehabilitation Act and the Americans with Disabilities Act.

### FOURTH CLAIM FOR RELIEF

Plaintiff re-alleges paragraphs 1 through 149 above as though fully set forth herein.

150. At the time of the arrest described above, no exigent circumstances were presented to any police officer, including the Vermont State Police and Trooper Vitali.

151. At the time of the arrest described above, Plaintiff presented no risk of flight.

152. At the time of the arrest described above, arrest or seizure was not required to preserve or protect any evidence or crime scene, nor to detain or identify witnesses.

153. In fact, at no time during the arrest of Plaintiff did any member of the Vermont State Police seek to identify any witnesses to the arrest, preserve any evidence, perform any investigation, or prevent the flight of Plaintiff.

154. At the time of Plaintiff's arrest, only four persons were present at Nick's along with Defendant. Those persons were bartender Amy O'Brien, Plaintiff's father-in-law, and two male patrons. No one posed any threat of any nature whatsoever.

155. No reasonable police officer under the circumstances could reasonably have believed that there was any risk of flight, risk of loss of evidence or witnesses, or other circumstances which required arrest, as opposed to citation.

156. Indeed, after arresting, handcuffing, and transporting Plaintiff, and after photographing and fingerprinting Plaintiff, all the Vermont State Police did was to hand Plaintiff a citation, all of which could have been done without arrest.

157. The arrest was based solely upon the determination of Defendant Vitali and Vermont State Police that probable cause existed sufficient to support an arrest.

158. While said standard is sufficient under V.R.Cr.P. 3, arrest of Plaintiff under the circumstances presented in the instant matter, without exigent or other balancing circumstances, violate rights secured to Plaintiff under Chapter 1, Article Eleven of the Vermont Constitution, *as applied* to the instant matter. Article Eleven provides that arrest may occur only upon warrant supported by sworn affidavit. No arrest warrant was issued in the instant matter, nor was any sworn affidavit reviewed by any magistrate or judicial official prior to arrest.

159. A direct right of action exists under Chapter 1, Article Eleven of the Vermont Constitution.

## FIFTH CLAIM FOR RELIEF

Plaintiff re-alleges paragraphs 1 through 159 above as if set forth in full herein

160.    By intentionally disregarding Plaintiff's deafness, by intentionally intimidating Plaintiff with a large compliment of unnecessary police officers, by arresting rather than citing Plaintiff under the circumstances described above, by threatening to handcuff and arrest Plaintiff for obstruction of justice, a charge which could not possibly have applied in the circumstances at bar, and by performing the other acts described above, Defendant Vitali intentionally, willfully, and deliberately inflicted emotional injury upon Plaintiff.

161.    Said injury was inflicted with the sole purpose of intimidating, humiliating and emotionally injuring Plaintiff and was a continuation of the anger felt by Vitali on the night Vitali had been excluded from Nick's.

162.    Because superior officers, including commanders, approved and condoned the actions of Defendant Vitali described above, and because numerous members of Defendant Vermont State Police participated in said actions, Defendant Vermont State Police is liable to Plaintiff for the intentional infliction of emotional injury.

## SIXTH CLAIM FOR RELIEF

Plaintiff realleges the allegations set forth in Paragraphs 1-161 above as though fully set forth herein.

163.    The Vermont Supreme Court, in *Department of Corrections v. Human Rights Commission,* 2006 VT 134 , 917 A.2d 451 (2006) held that all governmental entities are subject to Vermont's Fair Housing and Public Accommodations Act, 9 V.S.A. § 4500 *et seq.*

-27-

164. The Vermont State Police Barracks in Rockingham, Vermont, is a "place of public accommodation" within the meaning of that Act. Defendant Vermont State Police is a "public accommodation" within the meaning of that Act as set forth in *Department of Corrections, supra, Id.* at ¶ 8. "Public accommodation" is defined as "an individual, organization, governmental or other entity that owns, leases, leases to or operates a place of public accommodation." *Id. (citing* § 4501(8)).

165. Under the Vermont Fair Housing and Public Accommodation Act, Defendant Vermont State Police may not discriminate on account of disability.

166. The facilities, services, and/or activities of the Defendant Vermont State Police are "public accommodations" within the meaning of Vermont's Public Accommodation statutes, 9 V.S.A. § 4500 *et seq.*

167. Title 9 V.S.A., § 4502, bars discrimination by Defendant Vermont State Police against persons on account of disability in any activities, services, facilities, advantages, or accommodations.

168. In connection with the booking and arrest of Plaintiff, Defendant Vermont State Police failed to make reasonable accommodations in its procedures and/or take steps necessary to ensure that Plaintiff was not denied services or public accommodation, as defined in the Vermont Fair Housing and Public Accommodation Act, on a disparate and discriminatory basis. Said omissions and failures violate 9 V.S.A. §4502(c).

169. A person aggrieved by a failure of a public accommodation, including Defendant Vermont State Police, to comply with the Act may bring a civil suit against the public accommodation and the entity controlling such accommodation. 9 V.S.A. § 4506. The

relief which may be had in such civil action may include compensatory damages, punitive damages, and reasonable attorney's fees. § 4506(a) and (b).

170. As a direct result of all of the acts and omissions of all the Defendants described herein, Plaintiff has been damaged.

✧

**WHEREFORE**, Plaintiff prays that this Honorable Court grant Plaintiff judgment and the following relief:

1. Compensatory damages in such amount as the trier of fact may deem just.

2. Punitive damages where allowed by law.

3. Plaintiff's reasonable costs and attorney's fees as allowed under 42 U.S.C. § 1988, the Americans with Disabilities Act, the Rehabilitation Act of 1973, and the Vermont Fair Housing and Public Accommodations Act, as appropriate.

4. Such other and further relief as this Court may deem just and equitable.

DATED at Rutland, Vermont this _____ day of August, 2007.

**BIEDERMAN LAW OFFICE**

_____

ALAN P. BIEDERMAN, ESQ.
L. MAXWELL TAYLOR, ESQ.
P.O. Box 6001
Rutland, VT  05702-6001
802-775-1200 (Phone)
802-775-1169 (Fax)

Attorneys for Plaintiff

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all issues so triable.

DATED at Rutland, Vermont this⟍ day of August, 2007.

**BIEDERMAN LAW OFFICE**

ALAN P. BIEDERMAN, ESQ.
L. MAXWELL TAYLOR, ESQ.
P.O. Box 6001
Rutland, VT  05702-6001
802-775-1200 (Phone)
802-775-1169 (Fax)

Attorneys for Plaintiff