UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

WAYNE RYAN,                       :
Plaintiff,                       :
                                 :
              v.                 :  File No.2:07-CV-168
                                 :
VERMONT STATE POLICE             :
and                              :
ERIC VITALI,                     :
Defendants.                      :


OPINION AND ORDER
(Doc. No. 64)


        Wayne Ryan filed this civil action against the
Village of Bellows Falls, its police chief, an officer of
the Bellows Falls Police Department, the Vermont State
Police and Trooper Eric Vitali ("Vitali") as a consequence
of the arrest of Ryan on June 21, 2006 in the Village of
Bellows Falls, Vermont.  All of the counts in the complaint
have been dismissed except Count Three and Count Five.
Count Three alleges that the Vermont State Police violated
the Americans with Disabilities Act and the Rehabilitation
Act in the arrest and booking of the plaintiff.  Count Five
alleges that Trooper Vitali engaged in the intentional
infliction of emotional distress upon the plaintiff during
the course of that arrest and booking.

**I. Preliminary Statement**

        Before the Court are motions for summary judgment

1

filed by defendants Vermont State Police ("VSP") and Trooper
Vitali seeking dismissal of Count Three of the complaint,
which charges the VSP alone with conduct that plaintiff
asserts violated the Americans with Disabilities Act
("ADA"), 42 U.S.C. § 12132, and Section 504 of the
Rehabilitation Act, 29 U.S.C. § 794; and Count Five which
alleges that Vitalli engaged in the intentional infliction
of emotional distress ("IIED") when arresting Ryan. (Doc.
64, 64-2).

Ryan, who is deaf and an amputee who cannot walk
without using a cane, is the proprietor of a Bellows Falls
establishment known as "Nick's Café."  On June 21, 2006, he
was arrested without a warrant by the Vermont State Police
for hindering a law enforcement officer (Vitali) five days
earlier, on June 16, 2006, in violation of 13 V.S.A. § 3001.
Although probable cause for that charge was initially found
to exist by a state court judge, that charge was dismissed
eleven months later by the Windsor County District Court for
lack of a prima facie case.

The VSP now seek summary judgment, contending that
(1) the arrest of Ryan was not a "service, program or
activity" under the ADA or the Rehabilitation Act and (2)
assuming an arrest is a "service, program or activity" under
the Acts, the accommodations made for Ryan when he was

arrested were sufficient under both Acts and that the defendant was not discriminated against because of his disabilities.  Vitali asserts that his conduct did not rise to the level of the intentional infliction of emotional distress, that no cognizable injury been shown and that, in any event, he has qualified immunity.

Ryan opposes summary judgment, asserting in reply that reasonable jurors could conclude that Ryan was arrested solely because of his deafness and mobility impairment, and that the VSP made no real effort to accommodate Ryan's disabilities in the arrest, transportation, and booking process.  Further, Ryan asserts that reasonable jurors could conclude that Trooper Vitali's conduct was "outrageous" in both participating in the decision to arrest, and accomplishing the arrest of a man with a readily apparent disability, and therefore amounted to IIED.  Ryan also argues that Vitali should not be subject to qualified immunity.

## II. STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered forthwith if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a

judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, *Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 580 (2d Cir. 1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. *See, e.g.*, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994); *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. *See, e.g.*, *Celotex Corp.*, 477 U.S. at 323.

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, (1986). Instead, the non-moving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e); *accord, e.g.*, *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

To evaluate a fact's materiality, the substantive

4

law determines which facts are critical and which facts are irrelevant. *See*, *e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.  While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,][f]actual disputes that are irrelevant or unnecessary will not be counted." *Id*. at 248, (citations omitted); *see also*, e.g., *Knight v. United States Fire Ins. Co.*, 804 F.2d at 11-12.

In evaluating the record, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255; *see also*, e.g., *Chambers*, 43 F.3d at 36; *Gallo*, 22 F.3d at 1223.  The Court draws all inferences in favor of the nonmoving party only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g.*, *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987).  "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers*, 43 F.3d at 37.

## III. FACTUAL BACKGROUND

Wayne Ryan is the president and director of a Vermont corporation which owns and operates a bar known as

Nick's Café ("Nick's") in Bellows Falls, Vermont. Nick's
holds a first class liquor license issued under Title 7 of
the Vermont Statutes.  Ryan is also deaf.  He does not use
sign language, but he is able to communicate by lip reading
with varying degrees of accuracy.  Ryan has attended
mandated biennial training required of licensees by the
Vermont Liquor Control Board.  He has never sought an
accommodation from the Board as a consequence of his hearing
loss.  A Board investigator has spoken with Ryan on several
occasions and the investigator has not observed Ryan to
exhibit any inability to understand the investigator as long
as the investigator speaks directly to Ryan, in a loud and
clear manner.  Ryan is also an amputee, a leg having been
amputated at the hip several years ago as the result of a
motorcycle accident.  Ryan can only walk with the aid of a
cane.

On June 16, 2006 Defendant Vitali, a Vermont State
Trooper, and Christopher Brooks, an officer of the Bellows
Falls Police Department, were on duty in plainclothes and
were engaged in an investigation of underage drinking in
Bellows Falls.  It is a crime in Vermont for a licensee to
sell alcohol to a person under the age of 21.  7 V.S.A. §
658.  Vitali is of youthful appearance.  At approximately
11:30 p.m. the two officers sought admission into Nick's as

part of that investigation.  Upon initially entering the bar
the officers saw patrons who the officers perceived to be
potentially underage.

Plaintiff Ryan, who was seated at the door of the
dimly lit bar, was checking the identification of persons of
questionable age.  In accordance with Regulation 13 of the
Vermont Department of Liquor Control ("DLC") regulations,
Ryan requested "ID" from the pair.  Regulation 13 requires
liquor licensees to demand that persons of questionable age
exhibit either a Liquor Control Board Identification card, a
valid driver's license, a valid non-driver's identification
card, a U.S. military identification card or a valid
passport, all of which must bear the photograph and
signature of the bearer to gain entrance to a licensed
establishment. (Doc. 70-7).  Police identification is not
specified in the regulation as an appropriate form of
identification for admission into an establishment for
persons of questionable age.

In seeking to question the youthful looking
patrons about their age, and unaware at the time that Ryan
is deaf, the officers announced to Ryan the purpose of their
entry into the interior area bar.  A separate DLC
regulation, Regulation 8(a), compels Vermont liquor
licensees to cooperate with law enforcement officers in the

performance of their duties. (Doc 70-6).

Ryan did not understand the officers as he could
not see Vitali's lips and mouth when Vitali spoke.  It is
undisputed that to effectively communicate with a hearing
impaired person who can read lips, the speaker must
cooperate in that effort.

Ryan also found the police badges of Brooks and
Vitali were unacceptable as a form of ID given the language
of Regulation 13.  Brooks then presented his Bellows Falls
Police identification card to Ryan, which Ryan also
rejected.  Brooks showed his driver's license to Ryan and
Brooks was admitted to the bar.

Vitali, who had left his driver's license in his
cruiser, presented his Vermont State Police identification
card to Ryan, which Ryan also rejected as a form of
identification for persons appearing to be of questionable
age.  Vitali's date of birth appears on the police
identification, and Vitali attempted to call Ryan's
attention to that fact that he was of legal age.  Ryan twice
dropped the identification card.  Just prior to the second
drop, Ryan told Vitali "you are not coming in."  When Ryan
refused Vitali further entry to the bar, he placed his hands
on Vitali's shoulders and lightly pushed Vitali to direct
him to leave the premises.  Vitali did not perceive Ryan's

8

conduct to be assaultive in nature.  Vitali advised Ryan
that he would be arrested for obstruction of justice.
Officer Brooks intervened and suggested that the two
officers leave the bar and summon Brooks' supervisor, which
they did.

The supervisor, Sergeant John Dunfee, arrived on
scene.  When the three officers approached the bar entrance
and again began speaking to Ryan they were told by Ryan's
son, Jason, who had been tending bar, that Wayne Ryan was
deaf.  The son repeated the officers words to his father.
Vitali, displaying an  agitated demeanor, displayed a set of
handcuffs, and stated that Ryan would be arrested for
obstruction of justice.  Sgt. Dunfee advised that if the
officers were not admitted to the bar that evening Sgt.
Dunfee would shut the establishment down.  Still believing
that Vitali was underage, Ryan asked Sgt. Dunfee why he
wanted a minor admitted into a bar.  Nevertheless, Ryan
complied with Dunfee's request and the two investigating
officers were admitted to the bar.  No underage drinking was
detected, although some patrons had left the bar.

Following the events of June 16, Trp. Vitali
advised his superior officer, Sergeant Wolkenbrod, of the
events at the bar, and the sergeant instructed Vitali to
write an affidavit describing the incident as support for a

violation of 13 V.S.A. § 3001-Hindering a Law Enforcement
Officer.  After drafting the affidavit (Doc. 70-8), Vitali
was told by Wolkenbrod to arrest Ryan for the hindering
offense.  Wolkenbrod expressed concern that Ryan had placed
his hands on Vitali.  Another supervisor, Sgt. Robert
McCarthy, also expressed concern that Ryan had pushed Vitali
during the incident.  At some point prior to the arrest of
Ryan, Vitali provided a copy of his affidavit to a Windham
County State's Attorney who approved of the arrest plan.

On June 21, 2006 Vitali and five other officers
traveled to Nick's to effect the arrest of Ryan.
There have been bar fights at Nick's in the past which
required a police response.  According to the VSP and
Vitali, the number of officers was based on knowledge of the
prior fights and the presence of alcohol.  The arrest
occurred in the daylight hours.  There were no exigent
circumstances nor did Ryan present an immediate public
safety concern.  Vitali, his supervisor, and a third officer
entered the bar while three other officers remained outside.
For reasons not revealed in the record, the Bellows Falls
Chief of Police had earlier alerted the media to the arrest
plan, and media was present.

Vitali orally explained the reason for the arrest
to Ryan.  Ryan did not understand Vitali, and a bar

10

employee, Amie O'Brien, repeated Vitali's words to Ryan.
Ryan asked that the employee call his lawyer. Ryan learned
that he was to be transported to the Rockingham state police
barracks for arrest processing.  Ryan advised Vitali through
a family member that he could not walk to the cruiser while
both hands were handcuffed because of his disability.
Vitali placed  one of Ryan's hands in a handcuff, while
holding on to the other cuff.  Vitali discovered that Ryan
was an amputee when patting Ryan down for weapons.
Ryan walked to the cruiser, with the assistance of his cane
while linked to Vitali.

        Ryan was released from all forms of restraint in
order to enter the cruiser, after telling Vitali that he
could not safely be seated in the cruiser with his hands
bound in any fashion.  Upon being seated in the cruiser,
Ryan was handcuffed with his hands placed in front of him.

        Ryan was then transported by Vitali to the
Rockingham barracks, a process that was captured on video by
an interior cruiser camera, and which the Court has watched.
The ride was uneventful.  No conversation ensued during the
drive, except that the trooper suggested that Ryan alert him
if the air-conditioning unit made the vehicle too cold.

        Upon arrival at the barracks, Ryan was brought
into an arrest processing room for processing by Vitali.

11

The events in the arrest processing room were also captured
on video with audio, which video the Court has watched.
(Doc. 64-4, 64-5).  Ryan is observed entering the room
unrestrained, walking with his cane.  After taking a seat,
Ryan was served by Trp. Vitali with a written citation to
appear in the Vermont District Court on July 11, 2006 to
answer the hindering charge.  The citation was read to Ryan
by the trooper.  Ryan is literate, and he is observed on the
recording putting on his reading glasses, and apparently
reading the document which he then pocketed.  Ryan was also
told he would be released following arrest processing.  As
part of processing, Ryan was orally asked five routine
pedigree questions, including his weight, his eye color, his
place of birth, and the existence of tattoos.  The recording
tape reveals that Ryan was able to fully respond to these
four questions.  When asked whether or not he utilized an
alias Ryan did not understand the question.  In response,
the trooper wrote down the word "alias" and displayed it to
Ryan, Ryan orally responded in the negative.

        The trooper also asked Ryan to submit to a
photograph and fingerprints.  Ryan appears in the video
recording to object to having his fingerprints taken, and a
second officer was summoned.  The second officer orally
advised Ryan that if he didn't submit himself to

fingerprints he would later be the subject of a court order
compelling him to do so and it would be easier to accomplish
it now.  Ryan thereupon complied and submitted to a
photograph and fingerprinting without further protestation.
Ryan, who was unrestrained throughout the process, was then
released from custody.  The arrest processing sequence took
about 25 minutes to accomplish.

On July 5, 2006 the Windham County State's
Attorney filed an information, a formal criminal accusation,
charging Ryan with the felony hindering violation.  On July
11, 2006 Ryan appeared in state district court pursuant to
the citation. The court records reveal that Vermont District
Court Judge Katherine Hayes found pursuant to Vt. R. Crim.
P. 5(c) that probable cause existed to support the charge.
Ryan was arraigned on the charge and pled not guilty. (Doc.
64-10).  Ryan's release on conditions was continued.

Following discovery in the case, Ryan filed a
motion to dismiss the charge alleging a lack of a prima
facie case pursuant to Rule 12(d) of the Vermont Rules of
Criminal Procedure.  On May 14, 2007 the court granted the
motion, dismissing the charge.  The district court concluded
that the state had met its burden of establishing the
requisite element that Ryan's conduct had impeded an
investigation and the element that Ryan knew, or should have

known, that the officers were indeed law enforcement
officers acting in the course of their duties.  The court
also concluded that it would have been more prudent for Ryan
to have admitted Vitali into the bar given "Ryan's competing
obligations under [DLC] regulations 8(a) and 13".  However,
the court concluded that the state failed to prove that Ryan
did not have legal authority to act in the manner that he
did in light of the "rather rigid" language of Regulation 13
(Doc. 70-6) limiting acceptable forms of identification for
admission into licensed establishments.

## IV. Analysis

        Title II of the ADA provides, in pertinent part,
that: "no qualified individual with a disability shall, by
reason of such disability, be excluded from participation in
or be denied the benefits of the services, programs, or
activities of a public entity, or be subjected to
discrimination by any such entity."  42 U.S.C. § 12132
(1990).  The purpose of the Act is to "eliminate
discrimination on the basis of disability and ensure
evenhanded treatment between the disabled and the able-
bodied".  *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998).
To prove a violation of Title II of the ADA, a plaintiff
must demonstrate: "(1) that he is a 'qualified individual'
with a disability; (2) that he was excluded from

14

participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability." *Hargrave v. Vermont*, 340 F.3d 27, 34-35 (2d Cir. 2003); *K.M. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d 343, 357-58 (S.D.N.Y. 2005); *Blatch v. Hernandez*, 360 F. Supp. 2d 595, 629 (S.D.N.Y. 2005). Since "[t]hese requirements apply with equal force to plaintiffs' Rehabilitation Act claims," a court should analyze the claims in tandem. *See Hargrave v. Vermont*, 340 F.3d at 35; *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir. 2004) ("Since the standards adopted by Titles II and III of the ADA are, in most cases, the same as those required under the Rehabilitation Act, ... we consider the merits of these claims together."); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 (2d Cir. 2003) ("[U]nless one of those subtle distinctions [between the Rehabilitation Act and the ADA] is pertinent to a particular case, we treat claims under the two statutes identically.").

Under the ADA, a plaintiff must show that the discrimination was intentionally directed to him or her in particular. *Tucker v. Tennessee*, 539 F.3d 526 (6th Cir. 2008). If the plaintiff meets these requirements then the burden shifts to the defendant to show that the

accommodation provided was either effective or that the
accommodation sought and not provided would have resulted in
a fundamental alteration of necessary procedures or an undue
financial or administrative burden. *Tennessee v. Lane*, 541
U.S. 509 (2004).

As an initial matter, it is not disputed that
Ryan's disabilities make him a "qualified individual" under
the Act.  Furthermore, the arrest was consistent with
Vermont's Rules of Criminal Procedure.  Ryan was arrested
pursuant to Rule 3 of the Vermont Rules of Criminal
Procedure, which permits an officer to make a warrantless
arrest for a felony offense for which the officer has
probable cause.  *See Virginia v. Moore*, 128 S.Ct. 1598
(2008)(no Fourth Amendment violation where motorist was
arrested in circumstances where officer should have issued
summons).  The question presently before the Court is
whether, viewing the evidence in the light most favorable to
Ryan, a reasonable jury could determine that Ryan, by reason
of his disability, was "excluded from participation in or
[was] denied the benefits of services, programs, or
activities of a public entity, or was subject to
discrimination by such any such entity" by reason of that
arrest.  42 U.S.C. § 12132.  The "subject to discrimination"
clause of § 12132 is distinct and not tied directly to the

16

first clause of § 12132, which inquires of the exclusion of the disabled from the benefits of services, programs or activities.  *Bledsoe v. Palm Beach County Soil & Water Conservation District*, 133 F.3d 816, 821-22 (11th Cir. 1998).

With regard to the first clause of § 12132, the Second Circuit has not addressed the issue of whether an arrest itself is "a program, service or activity" covered by the ADA, and the issue is currently a subject of debate among the other Circuits.  *Bircoll v. Miami-Dade County*, 480 F.3rd 1072, 1084 (11th Cir. 2007).  A number of cases suggest that the ADA is inapplicable to arrests because an arrest is not the type of service, program, or activity from which a disabled person could be excluded or otherwise denied a benefit. *See Armstrong v. Wilson*, 124 F.3d 1019 (9th Cir. 1997) ("We agree with the Seventh Circuit's conclusion that although '[i]ncarceration itself is hardly a 'program' or 'activity' to which a disabled person might wish access, ... there is no doubt that an educational program is a program, and when it is provided by and in a state prison it is a program of a public entity.)'" (citing *Crawford v. Indiana Dept. of Corrections*, 115 F.3d 481, 483 (7th Cir. 1997)), cert. denied, 524 U.S. 937 (1998); *Rosen v. Montgomery County Maryland*, 121 F.3d 154, 157 (4th Cir.

17

1997) (holding, in a case involving a deaf person arrested
for drunk driving, that "calling a drunk driving arrest a
'program or activity' of the County, the 'essential
eligibility requirements' of which (in this case) are
weaving in traffic and being intoxicated, strikes us as a
stretch of the statutory language and of the underlying
legislative intent."); *Rylee v. Chapman*, 2008 WL 3538559,
slip opinion, (N.D. Ga. Aug. 11, 2008).  This case however
presents different circumstances. Ryan's arrest was not a
contemporaneous field response to immediate criminal
conduct, nor were there other exigent circumstances present.
Regardless, even assuming *arguendo* that the act of a law
enforcement officer effecting an arrest in these
circumstances is a "service, program or activity" of a
public entity, defendant VSP is entitled to judgment as a
matter of law.

          In the context of arrests, courts have generally
recognized, and distinguished, two types of claims under
Title II of the ADA: (1) a wrongful arrest claim, where
police arrest a suspect based on his disability, not for any
criminal activity; and (2) a claim that alleges a failure to
provide reasonable accommodations, where police properly
arrest a suspect but fail to reasonably accommodate his
disability during the investigation or arrest, causing him

to suffer greater injury or indignity than other arrestees. *Waller ex rel Estate of Hunt v. Danville, VA.*, 556 F.3d 171 (4th Cir. 2009); *Gohier v. Enright*, 186 F.3d 1216, 1220-21 (10th Cir. 1999); *see also Gorman v. Bartch*, 152 F.3d 907, 912-13 (8th Cir. 1998) (holding that a paraplegic arrestee could make out a reasonable accommodation claim under the ADA after being injured in a police van not equipped with wheelchair restraints).

### A. Claim of Arrest for Reasons of Disability

In his response to the defendants' motion, Ryan argues that the evidence shows that he was arrested *because* of his disability.  The difficulty with Ryan's  claim is that it has not been advanced in his complaint and cannot now be used to defeat a motion for summary judgement.

In his complaint, Ryan consistently asserted that he did not receive reasonable accommodations when he was arrested, not that he was arrested because of his disability.  For example, count 3 alleges that the VSP "..by intentionally, willfully and deliberately failing to **accommodate** plaintiff in any fashion on account of his deafness," and the complaint alleges repeated and detailed failures on the part of the VSP to provide accommodations in the arrest, transportation and booking process.  (Compl., Doc. 1, ¶ 149 (emphasis supplied)) *(Id. at ¶¶66-68, 138-*

19

146).

Ryan cannot now use a memorandum of law to change the theory of his case in order to defeat a motion for summary judgment. *Ribis v. Mike Bernard Chevrolet-Cadillac*, 468 F. Supp. 2d 489 (W.D.N.Y. 2007); *Beckman v. U.S. Postal Service*, 79 F. Supp. 2d 394 (S.D.N.Y. 2000)(collecting cases). Failure to provide accommodation and discrimination claims are, as the defendants point out, distinct theories under the law. *Green v Nat'l Steel Corp.*, 197 F.3d 894, 898 (7th Cir. 1999); *Marshall v. Federal Express Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997).[1] Accordingly, the issue of wrongful arrest is not properly before the Court.

However, even assuming that Ryan has properly pled a claim based on a discriminatory arrest, i.e., that the arrest was made because of Ryan's disabilities, Ryan cannot defeat the defendant's summary judgment motion. In the context of an unlawful arrest claim, Ryan must show that he was "intentionally discriminated against solely because of

---

[1] The only allegation in the complaint that could remotely support a wrongful arrest theory is the allegation in paragraph 142 where the plaintiff alleges that Vitali and the VSP "specifically elected to discriminate against the plaintiff by providing no assistance and by arresting Plaintiff under circumstances where the alternative issuance of a citation could have accomplished the same goal, i.e. the commencement of the criminal process." But this too is not an allegation of arrest for reasons of disability, but rather an allegation of a failure to provide the accommodation under the ADA, specifically the service of a citation. Felony arrestees, disabled or not, have no right to receive a citation in lieu of an actual arrest. *Moore*, supra.

[his] disability." *Tucker v. Tennessee*, 539 F.3rd 526 (6[th]
Cir. 2009).

The record here is devoid of any evidence that
Ryan was arrested solely because of his disabilities.  The
police did not confuse behavior caused by Ryan's
disabilities with criminal behavior.  The evidence shows
that Ryan was arrested because the officers believed they
had probable cause to believe that Ryan's refused admission
into the bar, despite proper police identification, was
hindering their investigation into possible underage
drinking.  Furthermore, viewing the evidence in the light
most favorable to the plaintiff, the defendants' motivation
in arresting Ryan was to improperly "educate" the plaintiff
that directions given by officers of the State Police are to
be obeyed; to gain retribution because Ryan-rightly or
wrongly-defied the authority of the trooper and in fact
physically directed Vitali out of the bar. Ryan's complaint
acknowledges this point repeatedly and quite directly in
several separate averments:

> "The decision to arrest, rather than issue a
> citation to appear in court, was done to intimidate and
> cause fear in Plaintiff, and with the improper purpose of
> educating plaintiff that the Vermont State Police and
> Defendant Vitali were to be obeyed when they sought entrance
> into Nick's café". (Compl., ¶49).

The complaint further alleges that:

The decision to arrest Plaintiff was therefore not

21

made for any valid police purpose but rather solely to demonstrate to plaintiff that he would receive harsh treatment for defying defendant Vitali. (Compl., ¶63).

The complaint also alleges that

Defendant Vitali, because of his anger and/or because of direction from other members of the Vermont State Police, elected to arrest Plaintiff rather than cite him notwithstanding the complete absence of exigent circumstances and notwithstanding the fact that five days had passed since the incident in which Vitali's identification was rejected. (Compl., ¶137).

Finally the complaint alleges that:

This handcuffing of the defendant was designed to intimidate, humiliate and psychologically injure the plaintiff. (Compl., ¶144).

There is simply nothing in the complaint or in the evidence to permit a reasonable juror to conclude that the VSP decided to arrest Ryan solely because he was deaf or an amputee. In addition, Ryan's averments are speculative and conclusory. "A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory, or based on speculation". *Major League Baseball Props., Inc. v. Salvino*, 542 F.3d 290, 310 (2d Cir. 2008). As such, there is no material factual dispute to be resolved by the jury. The complaint alleges repeated and detailed failures on the part of the VSP to provide accommodations to Ryan in the arrest, transportation and booking process. (Id. at ¶¶ 66-68, 138-

22

146).[2]  For these reasons, defendant VSP is entitled to
summary judgment on the claim that the arrest itself was
discriminatory.

### B. Failure to Provide Accommodations

The ADA does impose a duty on law enforcement to
provide arrestees who are disabled with reasonable
accommodations once an arrest of a disabled person has been
accomplished. Here, the VSP consistently provided sufficient
accommodation to put Ryan on an equal plane with non-
disabled arrestees.

Although the issue of whether Ryan was wrongfully
denied the benefit of programs or services within the
meaning of the ADA during the arrest processing is fact
intensive, there are no material facts in dispute here.

1. Transportation

The VSP had an obligation under the ADA to
reasonably accommodate Ryan's disabilities by  transporting
him in a safe and appropriate manner to the barracks for
arrest processing.  *Hainze v. Richards*, 207 F.3d 795 (5th
Cir. 2002); *Gorman v. Bartsch*, 152 F.2d 907, (8th Cir.
1998). Quite simply, this was done, and Ryan does not

---

[2]      At oral argument on this motion, plaintiff's counsel asserted that
paragraphs 127 and 134 of the complaint present a valid discriminatory
arrest claim.  The Court does not agree. Paragraph 127 is simply a
generalized statement of the law that the Rehabilitation Act precludes
discrimination.  Paragraph 134 alleges that Vitali's anger on June 16th
gave rise to a desire to arrest Ryan.

seriously argue otherwise.

Ryan was advised on June 16th that he was being
arrested through the services of the bar employee.  When his
status as an amputee was brought to the attention of the
officers, Ryan was permitted to walk to the cruiser with the
aid of his cane and not completely handcuffed. (Doc. 64,
Exhibit A).  He was permitted to sit down while not
handcuffed and then driven to the barracks with the hands
cuffed in the front of him.  His safety was secured by use
of a seat belt. His hearing disability was accommodated as
the officer asked no questions during the drive.  At the
barracks he was not restrained and in fact had access to his
cane.  There are just no "programs, activities or services"
which a non-disabled person would have received the benefit
of that Ryan did not receive.  He was simply transported in
a safe and appropriate manner.  At oral argument, counsel
for the plaintiff conceded that the manner of transportation
did not violate the ADA or the Rehabilitation Act.

2. Communication

The ADA requires police officers to take
appropriate steps to ensure that communication between deaf
arrestees and the police is at least as effective as
communication that would occur between the police and
hearing arrestees. *Bircoll*, 480 F.3d 1087.  The video of

24

this encounter clearly reveals that  there was indeed
effective communication between Ryan and the police. (Doc.
64, Exhibit B).  The *Bircoll* court laid out the factual
considerations to be taken into account in determining if
the communication was effective for a hearing impaired
person.  These include, but are not limited to:

> (1) the abilities of, and the usual and
> preferred method of communication used
> by, the hearing-impaired arrestee;
>
> (2) the nature of the criminal activity
> involved and the importance, complexity,
> context, and duration of the police
> communication at issue;
>
> (3) the location of the communication and
> whether it is a one-on-one communication;
> and
>
> (4) whether the arrestee's requested
> method of communication imposes an undue
> burden or fundamental change and whether
> another effective, but non-burdensome,
> method of communication exists.

*Bircoll*, 480 F.3d at 1087.  Ryan, who can read, was given a
written citation upon the start of the booking process.  The
document advised Ryan of the reason for the arrest.  He is
observed putting on his reading glasses and reading the
citation.  Only five basic pedigree questions were posed to
Ryan.  Ryan answered four of the five questions orally,
exhibiting an understanding of the nature of each specific
inquiry.  Only when asked about any prior aliases did Ryan

25

express an inability to understand and the officer then wrote down the word 'alias' to explain his question. Ryan promptly answered the question.

Ryan did not request to use a TTY telephone nor any other electronic aid.  This is perhaps because, as the tape reveals, communication between Ryan and the booking officer was effective.  Ryan now claims that the VSP should have permitted his son to be present as an accommodation to Ryan's deafness, but the son was not present at the barracks.  The video reveals only one minor communication issue concerning the use of an alias, and Ryan's hearing disability was accommodated by writing down that term.  The presence of Ryan's son or the provision of auxiliary aids would not have changed the booking process in any way. *Rosen*, 121 F.3d at 158.  Moreover Ryan was unrestrained throughout the process and exhibited no discomfort.  He simply cannot point to any injury nor denial of the benefits of any program or services an able bodied person would have received.  Thus, the means and methods of communication employed by the defendant State Police did not violate the ADA or the Rehabilitation Act.

3. Continued Investigation

Ryan was not subjected to interrogation or continued investigation.  The five routine pedigree

26

questions were devoid of any investigative function. *See United States v. Gotchis*, 803 F.2d 74,79 (2d. Cir. 1986). Ryan was served with the citation, photographed, and fingerprinted just as other non-disabled arrestees would have been.  He was then released from custody.

For these reasons defendant VSP is entitled to summary judgment on the ADA and the Rehabilitation Act claims.

## V. Intentional Infliction of Emotional Distress

Dismissal of the ADA/Rehabilitation Act count leaves this case without any federal claims.  The Second Circuit has instructed that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine ... will point toward declining to exercise jurisdiction over the remaining state-law claims." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (internal quotation marks and citation omitted); *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."); 28 U.S.C. §1367(c).

## VI.  Conclusion

Based on the foregoing, the Defendants' motion for

summary judgment on Count 3 of the complaint

(Doc. 64) is GRANTED.  The Court declines to exercise

supplemental jurisdiction on Count 5 and therefore that

Count is DISMISSED without prejudice.  All counts of the

complaint having been resolved, the case is DISMISSED.

Dated at Burlington, in the District of Vermont,

this 1st day of June, 2009.

/s/John M. Conroy
John M. Conroy
United States Magistrate Judge

28